UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on November 18, 2022

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. |
| v. | GRAND JUIRY ORIGINAL |
| JACOB BLAIR,<br>also known as "YVS,"<br>also known as "Colorshifting,'<br>also known as "YourVendorsSupplier,"<br>also known as "YVendorsSupplier,"<br><br>Defendant. | VIOLATIONS:<br>21 U.S.C. § 846<br>(Conspiracy to Distribute and Possess With Intent to Distribute Fentanyl, Methamphetamine, and Metonitazene)<br>18 U.S.C. §§ 1956(a)(1)(B)(i) and 2<br>(Money Laundering)<br><br>FORFEITURE:<br>21 U.S.C. § 853(a), (p); and<br>18 U.S.C. § 982(a)(1) |

**INDICTMENT**

The Grand Jury charges that:

**Introduction**

At all times relevant to the indictment:

1. "Virtual currency" or "cryptocurrency" is a form of online payment that uses cryptography to secure financial transactions. Cryptocurrency transactions may be recorded on a "blockchain," which is a cryptographically verified ledger of every transaction that occurs in a particular currency. Cryptocurrency transactions can be conducted with multiple inputs and multiple outputs to a single transaction. Cryptocurrency transactions take place between "addresses" on a blockchain, and a transfer of funds from a sender to a recipient may be broken

into multiple transactions that follow different paths to the same destination. One individual may control multiple "addresses," sometimes all as part of a single "account" or "wallet."

2. "Bitcoin," or BTC, is a common form of cryptocurrency. The BTC blockchain, or ledger, is publicly available. Users can view the movement of BTC from one "address" to another on the BTC blockchain. The BTC blockchain identifies the addresses and BTC amounts involved in transactions but does not identify who owned or controlled a particular address at any particular time. A BTC "Transaction ID number" uniquely identifies a particular BTC transaction. A BTC deposit address is a unique identifier that serves as a virtual location to which BTC can be sent. Most BTC users employ software that creates and manages a "wallet." The wallet software creates and controls "addresses" that are used to hold, send, and receive BTC.

3. The passcodes allowing users to access a bitcoin wallet, and transfer the bitcoin contained within it, may be stored on mobile devices, external or removable media, or computers. These passcodes can also be represented as long strings of characters, machine readable bar codes (QR codes), or hidden within other innocuous looking data such as image files. Private keys and "seed keys" (specialized passphrases that can be used to regenerate private keys), can also be stored on paper. Again, passwords for access to electronic wallets are typically complex and are often written down or saved in an accessible manner on paper or on some electronic device.

4. "Monero," or XMR, is another type of cryptocurrency. Unlike the bitcoin blockchain, the Monero blockchain is not publicly viewable. As described on the website getmonero.org, Monero is a "Private, decentralized cryptocurrency that keeps your finances confidential and secure." Monero includes a variety of features that help to obscure transactions true origins and destinations. Due to these enhanced security features, Monero is sometimes

classified as a "privacy coin." Monero can be used to conceal and disguise the origins and destinations of cryptocurrency transactions by exchanging one cryptocurrency for Monero, where cryptocurrency transactions cannot be readily observed, and then exchanging from Monero back into another cryptocurrency, such as bitcoin.

5. Tor2Door is a darknet market that operated much like a conventional e-commerce website: users can browse goods for sale from Tor2Door's home page, which are organized by category. These categories included "Fraud," "Drugs & Chemicals," "Digital Products," "Counterfeit Items," "Jewels & Gold," "Services," "Software & Hosting," and "Others." Subcategories under "Drugs and Chemicals" included "Benzos," "Cannabis & Hash," "Dissociatives," "Ecstasy," "Stimulants," "Opioids," "Prescriptions," "Others," and "Psychedelics."

6. Tor2Door was set up as a "hidden service" or "onion service" on the "dark web" also known as the "dark net" or the "darknet." The darknet is a part of the World Wide Web accessible only through anonymity-enhancing platforms such as the Tor network, a special network of computers on the Internet designed to conceal users' true IP addresses. Unlike computers on the ordinary Internet, whose IP addresses and locations can be determined more readily, computers on the Tor network cannot be easily located because their IP addresses are concealed.

7. Tor2Door does not allow transactions to be conducted in official, government-backed currencies. Instead, it required its users to transact in cryptocurrencies, specifically Bitcoin and Monero. These cryptocurrencies are not issued by any government, but rather, are generated and controlled through computer software operating on decentralized peer-to-peer

networks. Because cryptocurrencies are transferred peer-to-peer, users can often avoid traditional, regulated financial institutions, which collect information about their customers and maintain anti-money laundering and fraud programs.

8.  The operator(s) of Tor2Door allow vendors to sell products on their site in exchange for a commission fee. Vendors create their own profile page listing items for sale. Vendors publish descriptions of their products and operation to attract customers. Darknet markets additionally display the number of successful transactions and sales in order to give prospective customers confidence that transactions with a given vendor will proceed without issues.

9.  As of August 23, 2022, according to the Tor2Door "FAQ," the operators of Tor2Door charge a 5% "sales commission" for all goods sold on the website. This same page indicates that in order to become a vendor on Tor2Door, a prospective vendor must pay a "vendor bond" of $500 USD. This vendor bond grants a seller the ability to market their services or products on the website. Previously, in February of 2022, the "vendor bond" had been $300 USD according to the FAQ.

10. In addition to taking a commission fee or "cut" of the proceeds of each sale made by a vendor on Tor2Door, the operator(s) of Tor2Door also set forth a series of rules regarding what items were not permitted to be sold on the market. As of August 23, 2022, per the FAQ, the following products/services are prohibited on Tor2Door: "Child porn, Prostitution, Weapons, Murder services, terrorism, poison, fentanyl."

11. To access Tor2Door, users are required to create an account by completing fields on a registration page, including "Display Name," "Personal Phrase," "Username," "Password," "Confirm Password," "PIN," "Confirm PIN," and complete a "CAPTCHA,"

photo identification challenge.

### The Defendant

12. At all times relevant to this indictment, Jacob Blair was a resident of the States of Pennsylvania and West Virginia.

13. At all times relevant to this indictment, Jacob Blair, and others both known and unknown to the Grand Jury, operated vendor accounts on various darknet marketplaces, including Tor2Door.

14. Jacob Blair, and others both known and unknown to the Grand Jury, operated under the moniker "YVS" and "YVendorSupplier" on Tor2Door and created a vendor account and profile to advertise their controlled substances for sale.

15. The YVS vendor profile, operated by Jacob Blair and others both known and unknown to the Grand Jury, indicates that the vendor profile or account has been active on the Tor2Door market since at least May 2022 and, in that time, had completed at least 459 sales of illegal narcotics. YVS advertised themselves on Tor2Door as "a syndicate of professionals that specialize in making the best products the markets have to offer. We focus on quality, consistency, stealth, and speed. Nothing but the best. . . now vending on 5 markets, time will show that we mean business, and we're here to stay." YVS listed a variety of drugs for sale on their Tor2Door Market vendor account, to include several varieties of counterfeit oxycodone pills, counterfeit Adderall pills, and counterfeit Xanax pills. Counterfeit oxycodone pills contained Fentanyl and the counterfeit Adderall pills contained Methamphetamine.

16. YVS additionally advertised its products on the Alphabay, Nemesis, and ASAP DarkNet marketplaces. During this time, YVS completed at least 534 successful drug sales through

the ASAP Market and 406 successful drug sales through the Nemesis Market.

## Purpose of the Conspiracy

17. The purpose of the conspiracy was to distribute counterfeit controlled substances for profit by selling a variety of controlled substances on the dark web and shipping them throughout the United States, including the District of Columbia.

## Manner and Means

18. Jacob Blair, and others both known and unknown to the Grand Jury, manufactured and obtained counterfeit Oxycodone, Adderall and Xanax pills for sale.

19. Jacob Blair, and others both known and unknown to the Grand Jury, posted these controlled substances on Tor2Door and other marketplaces for sale. Jacob Blair, and others both known and unknown to the Grand Jury, received orders for controlled substances and received payment in the form of Bitcoin or Monero on Tor2Door and other marketplaces. After the payment was confirmed, Jacob Blair, and others both known and unknown to the Grand Jury would pack the controlled substances in vacuum-sealed packaging, packaging materials, and padded shipping envelopes to disguise the substance and drop the packages in various United States Postal Service drop boxes in West Virginia and Pennsylvania for shipment throughout the United States, including the District of Columbia.

20. Jacob Blair, and others both known and unknown to the Grand Jury, would occasionally communicate with customers through encrypted communications platforms such as Wickr and Threema.

21. Throughout the course of the conspiracy, Jacob Blair and others both known and unknown to the Grand Jury shipped counterfeit Oxycodone pills to the District of Columbia on at

least six occasions. These pills contained Fentanyl, a schedule II narcotic controlled substance and Metonitazene, a schedule I narcotic controlled substance.

22. Throughout the course of the conspiracy, Jacob Blair and others both known and unknown to the Grand Jury shipped counterfeit Xanax pills to the District of Columbia on at least two occasions.

23. Throughout the course of the conspiracy, Jacob Blair and others both known and unknown to the Grand Jury shipped counterfeit Adderall pills to the District of Columbia on at least three occasions. These pills contained Methamphetamine, a schedule II narcotic controlled substance.

24. Throughout the course of the conspiracy, Jacob Blair and others both known and unknown to the Grand Jury received payment for sales of controlled substances in the form of Bitcoin and Monero. Jacob Blair and others both known and unknown to the Grand Jury sent these proceeds between multiple cryptocurrency wallets and to various cryptocurrency exchange services in order to conceal and disguise the illicit source of the payments and exchange the illicit proceeds for US currency.

## COUNT ONE
**(Conspiracy to Distribute and Possess with the Intent to Distribute Controlled Substances 21 U.S.C. §§ 846, 841(b)(1)(B) and (b)(1)(C))**

25. The introductory allegations set forth in paragraphs 1 through 24 are re-alleged and incorporated by reference as though set forth herein.

### The Conspiracy

26.     From at least as early as August 1, 2022 through at least February 16, 2023, in the District of Columbia and elsewhere, the defendant,

**JACOB BLAIR,**
**Also known as "YVS,"**
**Also known as "Colorshifting,"**
**Also known as "YourVendorsSupplier,"**
**Also known as "YVendorsSupplier,"**

did knowingly and willfully combine, conspire, confederate, and agree together and with other persons both known and unknown to the Grand Jury, to unlawfully, knowingly and intentionally distribute and possess with intent to distribute forty grams or more of a mixture and substance containing a detectable amount of N-phenyl-N-[1-(2-phenyllethyl)-4-piperidninyl] propanamide (Fentanyl), a Schedule II narcotic drug controlled substance, and fifty grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II narcotic controlled substance, and a mixture and substance containing a detectable amount of N,N-diethyl-2-(2-(4- methoxybenzyl)-5-nitro-1Hbenzimidazol-1-yl)ethan-1-amine (Metonitazene), a Schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 846, 841(b)(1)(B) and 841(b)(1)(C).

**(Conspiracy to Distribute and Possess With Intent to Distribute Fentanyl, Methamphetamine, and Metonitazene**, in violation of Title 21, United States Code, Section 846)

### COUNT TWO

Beginning in or around August 1, 2022 and continuing through at least February 16, 2023, in the District of Columbia and elsewhere, defendant **JACOB BLAIR, also known as "YVS," also known as "Colorshifting," also known as "YourVendorsSupplier," also known as "VendorsSupplier,"** did knowingly conduct and attempt to conduct a financial transaction

affecting interstate and foreign commerce, to wit, conducting cryptocurrency transactions through various Bitcoin wallets, Kraken accounts, and BitPay accounts, which involved the proceeds of a specified unlawful activity, that is drug trafficking, knowing that the transaction was designed in whole and in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

(**Money Laundering**, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2)

## FORFEITURE ALLEGATION

1.  Upon conviction of the offenses alleged in Count One, the defendant shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853(a), any property constituting, or derived from, any proceeds obtained, directly or indirectly as the result of these offenses; and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of this offense. The United States will also seek forfeiture money judgment against the defendant equal to the value of any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of these offenses and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of these offenses.

2.  Upon conviction of the offenses alleged in Count Two, the defendant shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

3.  If any of the property described above as being subject to forfeiture, as a result of

any act or omission of the defendant:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third party;

    (c)    has been placed beyond the jurisdiction of the Court;

    (d)    has been substantially diminished in value; or

    (e)    has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

(**Criminal Forfeiture**, pursuant to Title 21, United States Code, Sections 853(a), (p) and Title 18, United States Code, Section 982(a)(1))

A TRUE BILL:

FOREPERSON.

*Matthew M. Graves /DTH*
Attorney of the United States in
and for the District of Columbia.